Lucretia M. ADAMS,
Plaintiff–Appellant,

v.

Otis R. BOWEN, Secretary of Health
and Human Services,
Defendant–Appellee.

No. 88–3743.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1989.

Decided April 19, 1989.

James S. Coon, Aitchison, Imperati, Barnett and Sherwood, P.C., Portland, Or., for plaintiff-appellant.

Craig J. Casey, Asst. U.S. Atty., Portland, Or., Gary J. Thogersen, Seattle, Wash., for defendant-appellee.

Before CANBY, THOMPSON and LEAVY, Circuit Judges.

CANBY, Circuit Judge:

Lucretia Adams appeals from the district court's decision upholding the determination of the Secretary of Health and Human Services (the Secretary) that Adams is not entitled to social security disability benefits, 683 F.Supp. 231. The Secretary's decision to deny benefits " 'will be disturbed only if it is not supported by substantial evidence or it is based on legal error.' " *Brawner v. Secretary of Health & Human Servs.*, 839 F.2d 432, 433 (9th Cir.1988) (quoting *Green v. Heckler*, 803 F.2d 528, 529 (9th Cir.1986)). *See* 42 U.S.C. § 405(g) (1982). We review the district court's conclusion *de novo*. *Gamer v. Secretary of Health & Human Servs.*, 815 F.2d 1275, 1278 (9th Cir.1987).

## BACKGROUND

The relevant facts are undisputed. Adams, a 56–year–old diabetic with impaired vision, has 32 quarters of coverage since 1980 and is "fully" insured under the requirements of 20 C.F.R. § 404.130 (1988). However, Adams does not have 20 quarters of coverage in the 40–quarter period ending with the quarter of alleged disability; therefore, she is not "specially" insured. Because Adams is "fully," but not "specially," insured, she must be statutorily blind in order to be eligible for disability benefits based upon her visual deficiency. 20 C.F.R. § 404.130(e). The statute defines blindness as follows:

> [T]he term "blindness" means central visual acuity of 20/200 or less in the better eye with the use of a correcting lens. An eye which is accompanied by a limitation in the fields of vision such that the widest diameter of the visual field subtends an angle no greater than 20 degrees shall be considered for purposes of this paragraph as having a central visual acuity of 20/200 or less.

42 U.S.C. § 416(i)(1)(B) (Supp. IV 1986).[1]

In December of 1980, Adams suffered a heart attack. During coronary bypass surgery several months later, Adams had a stroke leaving her totally blind with partial left-sided paralysis. Adams has recovered, largely successfully, from the effects of the stroke. She is no longer completely blind and has regained full use of all but her left hand.

Adams continues to suffer, however, from a neurological impairment affecting the "central processing of visual information." Although she has intact visual fields, and her visual acuity in each eye is approximately 20/50, Adams has difficulty processing visual information when the environment around her is moving. She cannot see well enough to put a staple in the

---

1. The language of the corresponding regulation simply tracks the statute:

   We will consider you blind under the law for a period of disability and for payment of disability insurance benefits if we determine that you are statutorily blind. Statutory blindness is defined in the law as central visual acuity of 20/200 or less ... in the better eye with the use of correcting lens. An eye which has a limitation in the field of vision so that the widest diameter of the visual field subtends an angle no greater than 20 degrees is considered to have a central visual acuity of 20/200 or less. 20 C.F.R. § 404.1581 (1988).

corner of a piece of paper and must avoid brick sidewalks and escalators, which make her nauseous. She trips and falls while walking. The consulting neuropsychologist described her condition as follows:

> While her visual acuity may well be relatively intact, her ability to perceive and use that visual information in an efficient manner is highly compromised. She is severely impaired on all tasks involving visual scanning and visual planning and organization. In this regard, while she is not blind in the sense of having lost the sensation of vision, she is in many ways worse off than someone who is blind. That is because of her difficulty with visuoprattic function and her ability to use efficiently what information is available to her. At this time, she is vocationally disabled because of this lack of visual efficiency.

The Administrative Law Judge (ALJ) noted that three opthalmologic specialists, including Adams' treating physician, agree that she is "functionally blind."

Despite Adams' functional blindness, the ALJ rejected her disability claim, reasoning that Adams does not strictly satisfy the highly specific statutory definition of blindness. The ALJ noted that Adams is clearly "visually disfunctional" and "would be found disabled if she were specially insured instead of only fully insured." The Appeals Council denied Adams' request for review of the ALJ's decision.

## DISCUSSION

Adams contends that, although 42 U.S.C. § 416(i)(1)(B) sets forth a specific definition of blindness for purposes of determining entitlement to disability benefits, "Congress cannot have intended that disability benefits be awarded to those who are effectively blind because of damage to their eyes while denying benefits to those who suffer the same impairment because of damage to the brain." In essence, Adams advocates the use of an equivalency requirement for the condition of blindness described in the statute. The Secretary, on the other hand, argues that there is nothing in the language of the statute or the legislative history "suggesting that Congress intended the Secretary to apply any standard other than the strict definition in the statute." Furthermore, the Secretary contends that the agency's interpretation of the statute and the implementing regulation are entitled to great deference. This is a case of first impression.

■ The basic rules of statutory construction are long-standing and well-settled:

> "In construing a statute in a case of first impression, we look to the traditional signposts of statutory construction: first, the language of the statute itself; second, its legislative history, and as an aid in interpreting Congress' intent, the interpretation given to it by its administering agency."

*Funbus Systems, Inc. v. California Pub. Util. Comm'n,* 801 F.2d 1120, 1125–26 (9th Cir.1986) (citation omitted). *See Washington State Dep't of Game v. I.C.C.,* 829 F.2d 877, 879 (9th Cir.1987). 42 U.S.C. § 416(i)(1)(B) presents a clear definition of what blindness "means." "As a rule, '[a] definition which declares what a term "means" ... excludes any meaning that is not stated.'" *Colautti v. Franklin,* 439 U.S. 379, 392–93 n. 10, 99 S.Ct. 675, 684 n. 10, 58 L.Ed.2d 596 (1979) (quoting 2A C. Sands, *Statutes and Statutory Construction* § 47.07 (4th ed. Supp.1978)). *See, e.g., Johns–Manville Corp. v. United States,* 855 F.2d 1556, 1559 (Fed.Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 1342, 103 L.Ed.2d 811 (1989); *Leber v. Pennsylvania Dep't of Envtl. Resources,* 780 F.2d 372, 376 (3d Cir.), *cert. denied,* 478 U.S. 1004, 106 S.Ct. 3294, 92 L.Ed.2d 710 (1986). Because the language of the statute is clear, the definition of blindness should be read and applied literally.

■ Nothing in the legislative history of the Social Security Amendments of 1967, including Section 416(i)(1)(B), suggests that Congress intended anything but a narrow reading of the statute's unambiguous language. *See Escobar Ruiz v. INS,* 838 F.2d 1020, 1023 (9th Cir.1988) (en banc) (even if a statute is plain and unambiguous, courts may look to see if there is clearly ex-

pressed legislative intent contrary to the language); *California v. Kleppe,* 604 F.2d 1187, 1194 (9th Cir.1979) (" '[E]ven the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent.' ") (quoting *National R.R. Passenger Corp. v. National Ass'n of R.R. Passengers,* 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974)). The Senate Report states only that "[i]n order to qualify for benefits a person would have to have vision of 20/200 or less." *See* 1967 U.S.Code Cong. & Adm. News 2834, 2842, 2886–87. Although the statute purposely "liberalized" the previous definition of blindness "[i]n recognition of the economic hardships faced by blind persons," *id.* at 2886, 3200, there is no indication that the equivalency requirement urged by Adams was intended or even contemplated by Congress.[2] Congress chose a certain and exact rule; we are reluctant to engraft upon it a more flexible standard that is inherently more difficult to administer.

Finally, the rules of statutory construction require us to consider the Secretary's interpretation of the statute. "The interpretation of statutes and regulations by an agency charged with their administration is entitled to due deference and should be accepted unless demonstrably irrational or clearly contrary to the plain meaning." *Nevitt v. United States,* 828 F.2d 1405, 1406–07 (9th Cir.1987) (citing *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965)). *See also Gardebring v. Jenkins,* 485 U.S. 415, 108 S.Ct. 1306, 1314, 99 L.Ed.2d 515 (1988) (deference to Secretary's reading of agency's regulation). While, as Adams points out,

this is not a case in which the Secretary has issued an *interpretative* regulation, we can evaluate the Secretary's interpretation as demonstrated by his position in this litigation and Section 26005.001 of the Secretary's Program Operations Manual System dealing with statutory blindness. The Secretary clearly interprets the statute to require a strict application of the statutory definition.

The Secretary's decision is supported by substantial evidence and is based on the application of a correct legal standard.

AFFIRMED.

---

2. The Senate Report does note that "[t]his definition of blindness is the definition in the Internal Revenue Code and is used by a number of governmental and private agencies." 1967 U.S. Code Cong. & Admin.News 2886. *See* I.R.C. § 151(d)(3) (1982) (repealed in 1986; preceded by I.R.C. § 25(b)(1)(C)(iii) (1948) and I.R.C. § 25(y) (1944)). Prior interpretations of Section 151(d)(3) or its predecessors might therefore be indicative of congressional intent because "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law...." *Cannon v. University of Chicago,* 441 U.S. 677, 696–97, 99 S.Ct. 1946,

1957–58, 60 L.Ed.2d 560 (1979). *See also Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 108 S.Ct. 1704, 1711–12, 100 L.Ed.2d 158 (1988); *Blitz v. Donovan,* 740 F.2d 1241, 1245 (D.C.Cir. 1984).

However, the only case dealing with the application of Section 151(d)(3) or its predecessors to a visual impairment not meeting the strict statutory definition appears to be *Hollman v. Commissioner,* 38 T.C. 251 (1962). Although the holding in *Hollman* supports Adams' functional blindness interpretation generally, *id.* at 258, 262, it is not sufficient to provide a clear insight into legislative intent.